JOYCE v. HUMBIRD et al.

WILLIAM T. JOYCE CO. v. SAME
(two cases).

Nos. 5444, 5462, 5463.

Circuit Court of Appeals, Seventh Circuit.

June 19, 1935.

Rehearing Denied July 26, 1935.

Franklin J. Stransky and John S. Burchmore, both of Chicago, Ill., for appellants.

Thomas L. Marshall and William G. Blood, both of Chicago, Ill., for appellees.

Before EVANS, SPARKS, and FITZ-HENRY, Circuit Judges.

EVANS, Circuit Judge.

The assignments of error relate to: (a) The insufficiency of the evidence to support the findings of fact and conclusions of law, and (b) the rulings of the court on the rejection of evidence.

We have been favored with thorough and exhaustive briefs, supplemented by extended oral arguments. Although counsel with commendable industry and though cooperation have succeeded in reducing the size of the record and have fully indexed the same in all three causes, we are unable to place ourselves in the position of the trial court who had the advantage of seeing and hearing the many witnesses who testified. Some of the evidence was presented by depositions, but most of it came from the lips of witnesses who appeared in person before the judge and were subjected to a thorough examination, direct and cross.

Upon all issues, appellees confidently assert that the evidence was ample to support the findings. In fact, they argue that the evidence so overwhelmingly supports their position that the charges of fraud are not even made in good faith.

Appellants, on the other hand, argue that the findings of fact and conclusions of law are both contrary to the weight of the evidence. It is by them urged that the court fell into its error because of its improper approach to the issues of fact; that the action of the parties should be viewed as though a fiduciary relationship existed between appellees and appellants and that appellees imposed upon the trusting and confiding nature of appellants and as a result succeeded in unloading worthless stock on them. Appellants say they never investigated the merits of the business venture because of their trust and faith in their associates; that these men were not only their associates, but for three generations, intimate business dealings between the Joyces, the Humbirds, and the Weyerhaeusers had induced the utmost faith and confidence and lulled all suspicions of possible fraud of any kind. They argue that the issue of fraud, which is the determinative one in this case, cannot be properly approached or disposed of except on the theory that appellees occupied the position of a fiduciary toward appellants and the latter's action cannot otherwise be explained or understood. The court rejected this theory, and appellants assail the other findings and conclusions on the theory that they followed the court's erroneous assumption that no fiduciary relationship existed.

388

Appellees, while stoutly denying the existence of the fiduciary relation, also assert, and the court so found, that no misrepresentations as to quantity, quality, location or value of timber were made by Humbird at the time the stock was sold to the Joyces.

The transactions out of which the suits grew involve millions of dollars, but the issues of fact and law are similar to those which confront the courts daily. One party sold to another a large block of stock for which the latter agreed to pay approximately two million dollars. Provision was made for partial payments on future dates. For several years the payments were made as agreed upon. The property of the corporation, the stock of which was sold, was limited to real estate. The corporation had never engaged in any business up to the date of the transactions in question. It had acquired title to 200,000 acres of timber land in Idaho. The controlling interest in the corporation was in another family, the Weyerhaeuser family. The property was being held until the time was ripe to convert the growing timber into lumber. This, in the judgment of Weyerhaeuser, occurred in 1927. The largest and most complete mill in the world, costing $4,000,000, was erected. Operations began and the depression soon followed. It early struck the lumber business. In 1931, the appellants claim to have discovered that they had been defrauded and refused to make further payments on their contracts and demanded the return of all payments which had been made. They offered to return the stock.

There were, in all, four contracts executed by Joyces and Humbirds. On January 3, 1925, appellees sold James Stanley Joyce 2500 shares of stock for $500,000. On May 22, 1925, the appellees sold William T. Joyce Company 2500 shares for $500,000. On May 7, 1926, appellees sold James Stanley Joyce 1775 shares for $355,000. On March 3, 1927, appellees sold William T. Joyce Company 2662½ shares for $443,750.

In 1900, the Clearwater Timber Company was organized with a capital stock of $500,000, which was increased to $3,000,000 in 1912, and again increased to $6,000,000 in 1924 and further increased to $9,000,000 in 1926. Par was $100.

The alleged fraud in the sale of the stock as claimed by appellants consisted of misrepresentations as to:

(a) Number of acres of timber land owned by the Clearwater Company.

(b) The amount of timber upon such land.

(c) The amount of white pine timber on the land and the quality of the white pine timber.

(d) The financial statement of the company made shortly before the stock was sold, which financial statement was prepared by appellees with the avowed purpose of selling the increase in capital stock to appellants.

As a background for the effective results which the false and fraudulent statements produced upon appellants, they point to the alleged fiduciary relationship which existed, and state that because of this relationship they never made independent inquiry into the quantity and quality of pine on the land and never discovered the deception or fraud until 1931, or years after stock was purchased.

The court found each and every issue against appellants.

We will discuss only briefly each issue raised because it would serve no useful purpose to set forth in detail all the evidence to show thereby that each finding is supported by substantial evidence. Our duty is merely to ascertain whether there is substantial evidence to support the findings of the court. Boak v. Robie (C. C. A.) 16 F.(2d) 33.

As to the representation of quantity, the letter of October 28, 1924, we think, marks the extent of the representation.

"It (Clearwater Timber Company) now owns two hundred thousand acres of white pine land, well blocked, having on this land in excess of four billion feet of timber, more than two billion feet of which is white pine of splendid quality."

Not only did the evidence show an acreage of 200,000, but it overwhelmingly established such fact. If we were to attempt an exact finding, it would be that the company owned 200,950.97 acres.

As to the statement "having on this land in excess of four billion feet of timber, more than two billion feet of which is white pine of splendid quality," the

important fact representation was the reference to the two billion feet of white pine of splendid quality.

Appellants argue that the representation which Humbird made in reference to this pine was that "the Clearwater Timber Company owned more than 200,000 acres of timber land, well blocked, containing over 4,000,000,000 feet of timber; *that some sixty to seventy-five per cent.* of the timber was white pine."

Appellees asserted, and the court found, the fact representation appearing in the letter of October 28 above quoted was the most extreme statement of amount which Humbird made. This finding is not only supported by the evidence of Humbird, but appellants' sworn answer contained the following allegation:

"Said Humbird represented to defendant that Clearwater Timber Company owned in excess of Four billion feet of timber, *more than 50% of which was white pine* of good quality."

It is quite inconceivable that appellants, when seeking to avoid the possibility of a large money judgment by charging fraud as a defense, should assert in their pleadings that the false representation was that "more than 50% of the timber was white pine" when in fact said representation was that 60% to 75% of the timber was white pine.

The sharp dispute over this issue of fact no doubt had its bearing upon the disposition of other fact issues. The disposition of the case turned largely upon an ascertainment of the quantity and quality of pine and the representations respecting pine. The determination of this issue was in fact well nigh decisive of the issue of fraud. If Joyce's testimony were false then the court was supplied with a test by which the rest of Joyce's testimony and conduct might be measured. If the court determined the issue adversely to appellees, it was equally destructive of their profession of good faith and honesty. Not only was the veracity of Joyce and Humbird involved, but the inferences and implications which arose from a finding thereon permeated all other issues. If Joyce testified falsely on a vital issue of fact, it rather effectively proved him to be a repudiator who would go to the extreme of perjury to avoid the obligation of his contract. On the other hand, if the finding were against Humbird, then

it would be difficult, if not impossible, for the court to avoid a finding of fraudulent intent on Humbird's part.

It is possible but most unlikely that counsel, in ascertaining the fraudulent representations made by Humbird upon which he was to base the fraud charge, misunderstood Joyce and the misrepresentation was 60% to 75% of white pine instead of 50% as stated in the answer. It is also possible, but we think quite unlikely, that such pleading when sworn to by Joyce was by him not understood. On the other hand, the court might well assume that counsel who drew appellants' pleadings obtained his facts from his clients; that the clients, when they signed their answers and counterclaims and under oath asserted the truth of the statements therein appearing, were in fact speaking the truth, and that the testimony subsequently given by said clients was at variance with the facts. Our duty does not go to weighing the conflicting evidence and inferences. We have examined the record carefully and reached the conclusion that the evidence supports the finding.

Humbird represented the timber on the 200,000 acre tract was 50% white pine. Documentary evidence supports this finding. Among such documents are: the letter above quoted; statements made by Clearwater Timber Company to Government agencies; written reports of the cruiser Nichols to Joyce; and the report of Weyerhaeuser.

Whether there were *two billion feet* of white pine *of splendid quality* on the 200,000 acres, *well blocked,* as found by the District Court, was an issue concerning which there was a dispute. Cruisers and other witnesses were produced who gave opinion evidence as to the quality of timber and the percentage of pine to the total of all kinds of timber. Upon this issue there was a wealth of evidence. Appellants produced witnesses who made computations from the record of the sawmill after some pine had been cut. The weight of such testimony was challenged as was the credibility of the witnesses who testified for appellees. It is sufficient to say that there was testimony which, if accepted, placed the white pine timber at 2,300,000,000 feet. There was, on the other hand, testimony which, if accepted, would have placed it as low as 1,600,000,000 feet. Likewise, there was

much difference of opinion as to the quality of the timber. Some witnesses found much catface, while others belittled the damaging effect of fires. The age of some of this pine timber was nearly two hundred years. That there had been some damage from fires was conceded. It is also apparent that in all pine forests where growth covered such a long period of time, some damage to the timber traceable to fire is always present.

The weight of the evidence, considering interest and number of witnesses, indicated that the Clearwater tract of pine was one of the best, if not the best, large tract of pine timber in Idaho which had not been developed.

In the face of the contrariety of opinions the finding of the District Court as to quality is accepted as a verity.

We pass over the other contentions of appellants rather hastily. If there were no misrepresentations, it matters not whether a confidential relationship existed between Humbird and the Joyces. The court found there was none, and we need only observe that the evidence supports such finding. Undoubtedly, the Joyces had confidence in Humbird's judgment, integrity, and ability. There is, however, a difference between a confidential or trust relationship and the existence of facts wherein one party to the transaction has confidence in the judgment, honesty, and ability of the other. Both the Joyces and Humbird were thoroughly experienced lumbermen and timbermen. Moreover, they were well versed in the pine lumber business. Stanley Joyce was thirty-five years of age; David Joyce, thirty-nine. Their holdings in timber lands, lumber companies, sawmill properties, and in retail lumber yards were extensive. In all their fields of activity, they had to do with pine. Their father had been in the lumber and timber business before them. They had grown up in it and had successfully conducted the extensive business left them by their father. The same could be said of Humbird. Their fathers' relationships had been cordial, and in enterprises where both had invested heavily, large profits had been made, an experience quite conducive to the making of friendships.

If we were otherwise uncertain about the correct determination of these cases, our judgment would be largely influenced by the action of the Weyerhaeusers. Undoubtedly both Humbird and the Joyces had great faith and confidence in the judgment, reputation, and experience of the Weyerhaeusers who were the principal stockholders of the Clearwater Timber Company. The record of the house of Weyerhaeuser was an impressive one. We think it quite clear that the Joyces relied on the fact that the Weyerhaeuser sales organization and the Weyerhaeuser lumber organization were back of the Clearwater Timber Company venture. This was what made the venture attractive. Weyerhaeusers were not interested in a stock selling enterprise. They were not interested in this litigation. The Weyerhaeuser interests expended millions of dollars in this Clearwater timber tract. Their faith in its future was backed by their acquisition of stock, and they contributed much more in the purchase of stock under stock rights and the acquisition of additional pine lands in this neighborhood. Their confidence was further evidenced by the erection of the largest and most complete lumber mill in the world, the cost of which necessitated a further advancement on their part of large sums. As they had no stock to sell and were in no way interested in the controversy between Humbird and the Joyces, but were friendly to both, the court may well look to their action and deeds to determine the good or bad faith of the Clearwater Timber Company enterprise and the increases in total capital stock which could not have been voted without the affirmative action of the Weyerhaeuser interests. From all this evidence, we cannot escape the conclusion that it was the honest belief of those who developed the Clearwater Company enterprise that it would be a profitable venture. So great was their faith in its future that only those joined who had in the past participated in like venturesome enterprises. The hazards which attended such a large, venturesome enterprise were not unknown to any of them. They doubtless visioned pots of gold at the end of the rainbow, and they discounted the possible effects of the great use of cement and steel upon the building industry and the depth and persistence of a depression. The venture was not one for the timid. Nor was its success to be determined by the records of previous undertakings of like character. The changes which have occurred in the use of building material, the unfortunate depression which began even before the

crash of 1929 soon lay heavily in the lap of the lumber industry. Hindsight proved better and clearer than foresight. Today all parties can more clearly appreciate the risks of the lumber business than they did in 1925. But, one's mistakes in judgment provable only by experience cannot be charged to others. They must be borne by him whose judgment was wrong.

We have discussed the facts so fully only because of the earnest insistence of counsel that the trial court erred in its findings to the great damage of ,appellants. We need hardly repeat that this court is not the trier of fact, but merely a reviewing court whose only function is to ascertain the existence of substantial evidence to sustain the findings.

We also have no hesitancy in saying that appellants were not harmed by the exclusion of evidence offered by them.

The judgments and decrees are Affirmed.